SIGNED this 29th day of September, 2015.



Dale L. Somers
United States Bankruptcy Judge

_____

Designated for print publication
**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| In Re:<br>**BROOKE CORPORATION, et al.,**<br><br>DEBTORS. | **CASE NO. 08-22786<br>CHAPTER 7** |
| **CHRISTOPHER J. REDMOND,<br>Chapter 7 Trustee of Brooke<br>Corporation, Brooke Capital<br>Corporation, and Brooke Investments,<br>Inc.,**<br><br>PLAINTIFF,<br><br>v.<br><br>**GMAC INSURANCE MANAGEMENT<br>CORPORATION d/b/a GMAC Integon,**<br><br>DEFENDANT. | **ADV. NO. 10-6197** |

**MEMORANDUM OPINION AND ORDER ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT,
GRANTING GMAC'S MOTION AND DENYING THE TRUSTEE'S MOTION**

Plaintiff Christopher J. Redmond, the Chapter 7 Trustee of Debtor Brooke Capital

Corporation, seeks to recover from Defendant GMAC Insurance Management Corporation (GMAC) as preferential transfers and fraudulent conveyances approximately $1 million in premium payments transferred by Brooke Capital to GMAC within the 90 days before Brooke Capital filed for relief under Title 11. The parties filed cross-motions for summary judgment, and arguments on the motions were heard on June 25, 2015. Plaintiff appeared in person and by his counsel, Michael J. Fielding of Husch Blackwell LLP. GMAC appeared by John W. McClelland of Armstrong Teasdale LLP. The Court has jurisdiction.[1]

## INTRODUCTION.

Brooke Agency Services Company, LLC (BASC), a non-debtor and a wholly-owned subsidiary of Debtor Brooke Corporation (Brooke Corp), was an agent of record for GMAC, an insurance carrier. BASC's producers or subagents collected insurance premiums for GMAC policies from insureds and transferred them to BASC, which then transferred them to Debtor Brooke Capital, a subsidiary of Debtor Brooke Corp. During the 90-day preference period, Brooke Capital in turn transferred over $1 million of these premiums to GMAC. The Trustee of Brooke Capital seeks to avoid these transfers.

---

[1] This Court has jurisdiction over the parties and the subject matter pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b), and the Amended Standing Order of Reference of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective June 24, 2013. D. Kan. Standing Order No. 13-1, *printed in* D. Kan. Rules of Practice and Procedure at 168 (March 2014). Furthermore, this Court may hear and finally adjudicate this matter because it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F) and (H). There is no objection to venue or jurisdiction over the parties.

**UNCONTROVERTED FACTS.**

**A.  General Background.**

Brooke Corp owns approximately 81% of the stock of Brooke Capital and is the one-hundred-per-cent owner of BASC.

Brooke Corp operated primarily through its operating subsidiaries:  Brooke Credit Corporation, which later changed its name to Aleritas Capital Corporation, and Brooke Franchise Corporation, which later changed its name to Brooke Capital.  Unless otherwise noted, Brooke Corp and its various subsidiaries are collectively referred to as Brooke.

**B.  Brooke's Insurance Business.**

During the first ten years of its existence, Brooke primarily sold administrative services to bank-owned insurance agencies.  In 1996, to expand its business, Brooke established a franchise model whereby insurance agencies would operate under the Brooke umbrella.  A lending program was developed to facilitate the acquisition of existing insurance agencies by Brooke franchisees.  Brooke Capital served as the franchise arm of Brooke.  Through the end of 2003, all Brooke franchises were conversion agencies, meaning that the franchisee owned or acquired an existing agency when it signed up to be a Brooke franchisee.  When a franchise was acquired, Brooke would typically loan the franchisee the entire amount it needed to purchase the agency. Commissions earned by Brooke insurance agents provided a source of revenue to pay the loans and to pay Brooke Capital for services it provided to the Brooke agencies.  In 2003, Brooke started securitizing the agency loans.  Bank of New York Mellon (BONY) served

as the trustee for the securitized loans. In 2004, Brooke also began a program of start-up agencies under which the franchisee was recruited and created a new agency without the benefit of existing business.

BASC was a Delaware limited liability company wholly owned by Brooke Corp that was organized in 2002. BASC was the entity that contracted with the insurance carriers and was the insurance agent of record for policies sold by the Brooke franchisees. There were separate agreements with each carrier, based upon the carrier's own template. Subject to the approval of the individual carriers, the agents of each of the Brooke franchisees were appointed as sub-producers under BASC's contracts with the insurance carriers. The carriers paid the commissions to BASC as the agent of record.

Brooke's system accommodated three insurance policy payment methods: direct bill; agency bill; and online bill. Premiums for direct-bill policies were remitted by the insured directly to the insurance carriers. Premiums for agency-bill and online-bill policies were transmitted to the agents (Brooke franchisees) who, in turn, transferred them to BASC for transmission to the carriers.

The online-bill-payment method was used by many carriers, including GMAC. A general description of the Brooke Insurance Transactions System used to process online bill payments is as follows. An agent received premiums from each insured. The agent would go into Brooke's proprietary computer software system and indicate the receipt of the premiums. The agent would simultaneously go to the website of the insurance carrier for which it had received premiums and inform the carrier of the receipt of the funds. The

4

agent would then deposit the premiums into one of approximately 90 sweep accounts that BASC maintained across the country. A reconciliation team at Brooke would then verify that the total funds had been deposited as the agent indicated. After a successful verification, those funds would be swept into the Consolidated Receipts Trust Account (CRTA) held in the name of BASC at First National Bank of Phillipsburg, Kansas. Commissions paid by insurance carriers were also transferred to the CRTA.

The transfer of funds from the CRTA changed over the preference period, but generally the funds were distributed either to the Master Receipts Trust Account (MRTA) in the name of BASC at BONY (for the benefit of the securitization trusts) or to the primary account Brooke Capital owned at First National Bank of Phillipsburg, Kansas ("Primary Account" or "FNB Primary Account"). Funds returned by BONY to Brooke Capital and other funds of Brooke Capital, including transfers from its operating account, also were deposited into the Primary Account. Brooke Capital maintained online sweep accounts for 133 carriers,[2] and transferred sufficient funds to these accounts for the carriers to withdraw the premiums owed to them. At least as to GMAC, the payments were accomplished through an ACH (Automated Clearing House) request that GMAC submitted for its particular sweep account.

The Trustee's expert, Kent E. Barrett, has provided a report concluding that it is not possible to trace individual receipts through BASC's and Brooke Capital's bank

---

[2] Doc. 153-9 at 11 n. 15 (Expert Report of Kent E. Barrett).

accounts to their ultimate disbursement to the insurance carriers involved because of the extensive commingling of funds. In addition, the expert concluded that tracing is not possible because of the delay (typically 3 to 7 days for online-bill payments) between the date of receipt from the franchisee agents and the date of disbursement to the insurance carriers. GMAC has not provided a report to the contrary and has not attempted to trace any funds, but does point out that Brooke reconciled the amount of deposits daily, and maintained records for each premium payment identifying the specific customer, the insurance carrier, and the amount paid. Whether tracing the premiums is possible is not material to the Court's decision. The important fact for this opinion is that premiums, commissions, and Brooke Capital's operating funds were commingled. This is not disputed.

### C. The Agency Relationship with GMAC.

GMAC generally provided insurance coverage for anything with wheels: automobiles, recreational vehicles, motorcycles, and commercial vehicles. Brooke Corp established an agency relationship with GMAC in 2000. In conjunction with this agreement, GMAC was given authority to sweep customer premiums from a Brooke Corp account at First National Bank & Trust in Phillipsburg, Kansas. In 2002, the GMAC agency agreement was assumed and transferred to BASC. The 2002 agreement is referred to as the "Agency Agreement." Article V, "Direct Billed or Premium Financed Policies," of the Agency Agreement provides as follows:

A.      With respect to direct billed or premium finance business (premium

financing is not permissible in all states):

1.      The Agent agrees to collect and remit to the Company the initial premium (either down payment or full payment as required by Company on a direct billed policy or down payment or full payment as required by Company on a premium financed policy) within the time period set forth from time to time by the Company together with each completed application.

2.      The Company shall bill all renewal or adjustment premiums direct to the insured or to a designated lending institution or servicing agency holding such premiums in escrow or reserve, and such premiums shall be payable in gross to the Company.

3.      Should any renewal, additional or endorsement premiums on business written pursuant to this Agreement come into the Agent's hands, the Agent shall remit said premium in gross to the Company within the time period set forth from time to time by the Company. Further, Agent agrees to hold all premiums collected by him as a fiduciary in trust for the Company until payment shall have been duly made to the Company.[3]

In connection with the Agency Agreement, GMAC was given authority to withdraw premiums from a "GMAC Sweep Account," an account owned by Brooke Capital at First National Bank of Phillipsburg, Kansas.[4]

Brooke franchisees selling GMAC insurance used the online method of premium payment. GMAC provided each Brooke producer agent with access to an on-line "E-agency" system that allowed the producer to input information concerning the proposed

---

[3] Doc. 153-1 at 4.

[4] Over time, different accounts were designated as the GMAC Sweep Account. These included accounts ***835 (Doc. 153-1 at 4) and ***789 (Doc. 155-4 at 3).

7

insured and their vehicle or vehicles, and provide an immediate quote to the customer. Upon approval of the quote by the customer and receipt of the required premium, the producer had the authority to bind the policy (that is, to bind GMAC to provide the coverage specified in the policy). In accord with the online payment described above, the premium would be deposited into the agency account, swept into a BASC sweep account, and then transferred to the CRTA. Four business days after the producer entered the information into the "E-agency" system, GMAC would initiate an ACH transfer from the GMAC Sweep Account at First National Bank of Phillipsburg, Kansas, in the name of Brooke Capital, for the amount of the premium. Until six days before Brooke Capital filed for relief under Chapter 11, when the GMAC Sweep Account was closed, Brooke Capital always had sufficient funds in the account to satisfy GMAC's withdrawals.

At the GMAC level, the process was fully automated. GMAC did not know that the GMAC Sweep Account was in the name of Brooke Capital rather than BASC, or that GMAC premium funds were commingled with premiums and commissions of other carriers, commingled with other funds of Brooke Capital, and diverted by Brooke Capital for uses other than paying premiums. Because the ACH withdrawals initiated by GMAC always cleared, GMAC did not consider BASC to be "out of trust" until six days before Brooke Corp and Brooke Capital filed for relief under Chapter 11, when GMAC was notified that the GMAC Sweep Account had been closed. During the preference period, Brooke Capital transferred $1,115,123 to the GMAC Sweep Account. Of this amount, $1,109,673 had been transferred by Brooke Capital from its FNB Primary Account to the

8

GMAC Sweep Account, and the remainder represents adjustments that GMAC had credited back to the GMAC Sweep Account.[5]

### D.  The BONY Action and Brooke's Bankruptcy.

On September 11, 2008, the Bank of New York Mellon (BONY), in its capacity as the trustee for the Brooke securitizations, filed a complaint against Brooke and others in the United States District Court for the District of Kansas, Case no. 08-CV-2424.  BONY contended that under the direction of Robert Orr, Brooke was depositing funds into an account at Brooke Savings instead of into an account at BONY that had been established to collect payments claimed to be owed to certain securitization entities and other lenders. BONY sought the appointment of Albert A. Riederer as a receiver, which Brooke opposed.  By a consent order, Riederer was appointed as a Special Master pursuant to Federal Rule of Civil Procedure 53.  Special Master Riederer continued Brooke's relationship with GMAC until October 22, 2008, when he notified GMAC, other carriers, and Brooke franchisees that the payment method was being terminated.  As a result, the GMAC Sweep Account was closed.

Brooke Corp and Brooke Capital filed voluntary Chapter 11 petitions on October 28, 2008.[6]  On October 29, 2008, the Bankruptcy Court entered an order appointing Riederer as the Chapter 11 Trustee of Brooke Corp and Brooke Capital.  On June 28,

---

[5] Doc. 153-9 at 33 (Expert Report of Kent E. Barrett).

[6] Brooke Investments filed a voluntary Chapter 11 petition on November 3, 2008.  The Brooke Investments proceeding has been administratively consolidated with those of Brooke Corp and Brooke Capital, but Brooke Investments otherwise plays no role in this action.

2009, the Bankruptcy Court entered an order converting the Debtors' bankruptcy cases to Chapter 7 and noted the U.S. Trustee's decision to appoint Riederer as the Chapter 7 Trustee of the Debtors upon conversion of the cases. On November 3, 2011, the Bankruptcy Court issued a notice of Riederer's resignation as Trustee and Christopher J. Redmond's appointment as the successor Trustee for each of the Debtors.

### E. The Complaint.

Trustee Riederer filed the original complaint against GMAC on October 25, 2010, alleging various causes of action. An Amended Complaint against GMAC was filed on July 12, 2012. When moving for summary judgment, Trustee Redmond seeks the following: (1) a finding that $1,109,567.67[7] in transfers from Brooke Capital to GMAC between July 30, 2008, and October 21, 2008, are avoidable preferential transfers pursuant to § 547(b); (2) a finding that the Trustee may recover the $1,109,567.67 from GMAC pursuant to § 550; (3) an award of prejudgment interest retroactive to October 10, 2010; and (4) an award of the Trustee's costs in bringing this action. The Trustee acknowledges that if the Court finds that the transfers to GMAC were on account of antecedent debts under § 547(b), then the fraudulent conveyance claim is moot.[8]

---

[7] The Expert Report of Kent E. Barrett (Doc. 153-9) on page 8 states, "The $1,109,567.67 of online bill funds disbursed to GMAC from Brooke Capital during the Preference Period was funded by transfers from Brooke Capital's primary account at First National Bank of Phillipsburg, Kansas." Page 33 of the same report states, "[T]he total $1,115,123 transferred into the [GMAC Sweep Account] during the Preference Period consisted of $1,109,673 transferred in from Brooke Capital's FNB Primary Account (per review of disbursements posted to the FNB Primary Account bank statements) and $5,450.03, apparently representing adjustments credited back to the GMAC Sweep Account by GMAC." The Court finds that the minor inconsistency in the amount transferred is not material.

[8] Doc. 157 at 31.

GMAC moves for summary judgment on the preferential transfer claims. First, GMAC asserts that the Trustee cannot meet his burden to prove that the transfers were transfers of property of the Debtor and that GMAC was a creditor of the Debtor. GMAC also moves for summary judgment on the rationale that the uncontroverted facts establish that the Trustee may not avoid the transfers because GMAC has proven the ordinary-course and contemporaneous-exchange defenses.

### F. The Trustee's Motion in Limine is Moot.

In conjunction with his summary judgment pleadings, the Trustee also filed a motion in limine to exclude certain opinions expressed in the deposition testimony of GMAC's expert. The motion is limited to testimony on the subject of business standards in the insurance industry.[9] The basis for the objection is that such testimony is beyond the scope of the written expert report of the same witness.[10] When moving for summary judgment, GMAC twice refers to the challenged testimony. The Court finds that it can rule on the summary judgment motions without considering the cited testimony and for that reason finds the motion in limine to be moot.

## DISCUSSION.

### A. The Trustee has established a prima facie preference case.

#### 1. The elements of avoidable preferential transfers.

---

[9] Doc. 151.

[10] *Id*. The Trustee cites *Gust v. Jones*, 162 F.3d 587, 592 (10th Cir. 1998), and *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008), to support the objection.

11

Section 547(b) provides:

> [T]he trustee may avoid any transfer of an interest of the
> debtor in property —
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor
> before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made . . on or within 90 days before the date of the filing
> of the petition; . . . and
> (5) that enables such creditor to receive more than such
> creditor would receive if — (A) the case were a case under
> chapter 7 of this title; (B) the transfer had not been made; and
> (C) such creditor received payment of such debt to the extent
> provided by the provisions of this title.

To establish a prima facie case regarding the transfers Brooke Capital made to GMAC, the Trustee must prove all of these elements. The Trustee argues that he has done so. GMAC challenges only the first element, which requires that the transfers be of an interest of Debtor Brooke Capital in property, and the second element, which requires that GMAC be a creditor of Brooke Capital. The Court concludes that the Trustee has satisfied the elements of a prima facie case and rejects GMAC's challenges to the first and second elements.

### 2. Brooke Capital's transfers to GMAC were of an interest in Brooke Capital's property, as required by § 547(b).

Brooke Capital's transfers of funds to GMAC were of an interest of Brooke Capital in property. Because of the purpose of the avoidance provisions of the Bankruptcy Code, "property of the debtor" subject to recovery as a preferential transfer "is best understood as that property that would have been part of the estate had it not been

12

transferred before the commencement of bankruptcy proceedings."[11]  Property of the estate is defined broadly by § 541, which, in turn usually looks to state law to define property interests.  In a case where property interests were defined by Kansas law, the Tenth Circuit adopted a dominion or control test for defining an interest in property for purposes of § 547.[12]  "Under this test, a transfer of property will be a transfer of 'an interest of the debtor in property' if the debtor exercised dominion or control over the transferred property."[13]

There is no doubt that Brooke Capital had dominion or control over the funds which were transferred to GMAC.  The ACH requests which initiated the transfers were made to the GMAC Sweep Account at First National Bank of Phillipsburg, Kansas, that was in the name of Brooke Capital.

When contending the Trustee has not proven that Brooke Capital had an interest in the funds, GMAC relies on the earmarking doctrine, a judicially-created doctrine excepting certain transfers from § 547.[14]  A respected treatise describes the doctrine as follows:

> The earmarking doctrine is accepted as a valid defense to a preference action.  It is an equitable doctrine which provides that when a new lender makes a loan to enable a

---

[11] *Begier v. IRS*, 496 U.S. 53, 58 (1990).

[12] *Parks v. FIA Card Services, N.A. (In re Marshall)*, 550 F.3d 1251, 1255-56 (10th Cir. 2008).

[13] *Id*. at 1255.

[14] *Hofmann v. Drabner (In re Baldwin)*, 514 B.R. 646, 656 (Bankr. D. Utah 2014).

13

debtor to pay a specified former lender, those funds are "earmarked" for that creditor. If the debtor exercises no control over the disposition of the earmarked funds, the funds do not become part of the debtor's estate, and no preference occurs.[15]

Three requirements must be met for earmarking to apply:

> (1) the existence of an agreement between the new lender and the debtor that the new funds will be used to pay a specified antecedent debt, (2) performance of that agreement according to its terms, and (3) the transaction viewed as a whole (including the transfer in of the new funds and the transfer out to the old creditor) does not result in any diminution of the estate.[16]

The earliest enunciations of the doctrine were in cases where the new creditor providing the new funds to pay off the old debt was obligated to pay off the old debt, such as a guarantor or surety.[17] Although some "courts have extended the doctrine beyond the guarantor situations,"[18] the Tenth Circuit BAP has declined to do so,[19] and the Tenth Circuit has expressed doubt about the expansion.[20] This is clearly not a guarantor situation. There is no evidence that BASC, or any other entity, guaranteed Brooke

---

[15] 4 William L. Norton, Jr., and William L. Norton III, *Norton Bankr. Law & Practice 3d*, § 66:16 at 58-6 (Thomson Reuters 2015).

[16] *McCuskey v. Nat'l Bank of Waterloo (In re Bohlen Enters., Ltd.)*, 859 F.2d 561, 566 (8th Cir. 1988).

[17] *Id*. at 565.

[18] *Id*. at 566.

[19] *Manchester v. First Bank & Trust Co. (In re Moses)*, 256 B.R. 641, 645-49 (10th Cir. BAP 2000).

[20] *Marshall*, 550 F.3d at 1257, n. 5.

14

Capital's obligation to GMAC. For this reason alone the Court does not find the doctrine applicable here.

But, in addition, even if the doctrine would be applicable where there is no guarantor, the Court finds that the necessary elements are not present. "[T]here are three parties required in an earmarking situation: an 'old creditor' (the pre-existing creditor who receives payment within the 90-day preference period), a 'new creditor' or 'new lender' (who supplies the funds to pay off the 'old creditor'), and the debtor."[21] GMAC identifies the three parties as the insured, the Brooke agent, and GMAC. Brooke Capital, the debtor who made the challenged transfers and is therefore a necessary party to any earmarked transaction, is missing from GMAC's analysis. If the earmarking doctrine were applicable, the three parties involved would necessarily be GMAC (the pre-existing creditor of Brooke Capital), BASC (who supplied the funds to pay GMAC), and Brooke Capital (the debtor who paid GMAC). But even this trio does not fit the earmarking pattern. Under the Brooke Insurance Transactions System, although BASC supplied the funds for Brooke Capital to pay GMAC, by doing so, BASC did not become a "new creditor" of Brooke Capital. BASC had no expectation that Brooke Capital would pay back the funds it transferred to Brooke Capital that were then used to pay GMAC. Further, GMAC did not become a creditor of Brooke Capital until BASC transferred the premium funds to Brooke Capital. In other words, GMAC was not a pre-existing creditor

---

[21] *Official Comm. of Unsecured Creditors v. Sharp Elecs. Corp. (In re Phelps Techs., Inc.)*, 245 B.R. 858, 868 (Bankr. W.D. Mo. 2000).

15

of Brooke Capital.  Finally, the central element of earmarking — an agreement for the

payment of a debt using earmarked funds — is not present.  There is no evidence of an

agreement between Brooke Capital and BASC identifying or earmarking specific funds

for the payment of GMAC.  The Court rejects GMAC's reliance on the earmarking

doctrine.

### 3.  The transfers to GMAC were for the benefit of a creditor in payment of an antecedent debt of Brooke Capital, as required by § 547(b)(2) and (3).

The Bankruptcy Code defines a "creditor" as an "entity that has a claim against the

debtor."[22]  A "claim" is a "right to payment, whether or not such right is reduced to

judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,

undisputed, legal, equitable, secured, or unsecured."[23]  A "debt" is a "liability on a

claim."[24]  The Agency Agreement between BASC and GMAC required BASC to pay

collected premiums to GMAC.  Brooke established the Brooke Insurance Transactions

System to fulfill this obligation.  The system provided for the transfer of the collected

premiums by BASC to Brooke Capital, followed by Brooke Capital's payment to GMAC

from the GMAC Sweep Account in the name of Brooke Capital.  GMAC agreed with

BASC that such payment would be accomplished by GMAC initiating an ACH request

for payment from the GMAC Sweep Account four business days after the agent or

---

[22] 11 U.S.C. § 101(10)(A).

[23] 11 U.S.C. § 101(5)(A).

[24] 11 U.S.C. § 101(12).

16

producer entered the policy information into the computer system. In this manner, GMAC became a creditor of Brooke Capital.

GMAC argues that it did not knowingly consent to a debtor-creditor relationship between itself and Brooke Capital. Based upon the Agency Agreement, GMAC understood that its debtor-creditor relationship was with BASC, not Brooke Capital. It observes that the legal issue of whether a debtor-creditor relationship can arise only with the consent of the parties has been raised in another Brooke adversary proceeding, *Redmond v. CJD*.[25] GMAC submits that if the Court holds in the *CJD* case that mutual consent is required, the ruling should also apply to this case. The Court has recently issued its opinion in *CJD*, finding, among other things, that mutual consent is not required to establish a debtor-creditor relationship.[26] The Court therefore denies GMAC's argument that the Trustee has failed to establish the existence of a debtor-creditor relationship as required for avoidance of a transfer under § 547(b)(2).

### 4. The Trustee has established the elements of § 547(b)(3), (4), and (5).

To prove the insolvency of Brooke Capital as required by § 547(b)(3), the Trustee relies upon § 547(f), which provides that for purposes of § 547, "the debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition." GMAC does not attempt to rebut the presumption. Section

---

[25] *Redmond v. CJD & Assocs., LLC (In re Brooke Corp.)*, ___ B.R. ___, 2015 WL 5301557, Case No. 08-22786, Adv. No. 11-6236, Memorandum Opinion and Order on Cross-Motions for Summary Judgment, Granting CJD's Motion and Denying the Trustee's Motion (Bankr. D. Kan. Sept. 8, 2015).

[26] *Id*. at *11.

547(b)(4) is satisfied because all of the transfers which the Trustee seeks to avoid were made on or within the 90-day period preceding Brooke Capital's filing of its petition. Finally, the Trustee argues that § 547(b)(5), which requires comparing what the creditor actually received in the challenged transfers to what it would have received under § 726 of the Code, is satisfied because the claims against Brooke Capital greatly exceed its total current assets and potentially recoverable litigation claims. GMAC does not argue otherwise.

**B. The Trustee may not avoid the allegedly preferential transfers to GMAC because they were made in the ordinary course of business under § 547(c)(2).**

Under § 547(c)(2), the Trustee may not recover ordinary-course preferential transfers. There are two elements to the defense: (1) the "transfer was in payment of a *debt* incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;" and (2) the *transfer* was either (a) "made in the ordinary course of business or financial affairs of the debtor and the transferee" or (b) "made according to ordinary business terms." GMAC contends that this defense applies to the avoidable preferential transfers from Brooke Capital to GMAC. As the preference defendant, GMAC has the burden of proving the defense, which is narrowly construed.[27]

As this Court's recent decision in *Redmond v. CJD* states, "Courts do not agree on

---

[27] *Jubber v. SMC Elec. Prods., Inc. (In re C.W. Mining Co.)*, ___ F.3d ___, 2015 WL 4717709 at *2 (10th Cir. Aug. 10, 2015); *Jobin v. McKay ( In re M & L Bus. Mach. Co., Inc.)*, 84 F.3d 1330, 1339 (10th Cir. 1996).

the interpretation of the debt-incurred element of § 547(c)(2)."[28]  There are two

competing interpretations.  One is the subjective test which asks "whether the debt

incurred was ordinary *as between* the debtor and the defendant."[29]  *Liberty Livestock*,[30]

which relied upon the Tenth Circuit's opinion in *Fidelity*,[31] is an example.  The second is

the objective test which looks to "whether the debt was incurred in the ordinary course of

each party's business, as viewed separate from their dealings with one another."[32]  *C.W.*

*Mining*,[33] recently decided by the Tenth Circuit, is an example of the second approach.  In

*CJD*, after reviewing the case law, with an emphasis on the cases in the Tenth Circuit,

this Court stated:

> The Court finds merit in both the subjective and
> objective tests . . .  There is no apparent reason why courts
> should adopt either the subjective or objective alternatives as
> controlling for all circumstances.  The Bankruptcy Code
> requirement that the transfer be "in payment of a debt
> incurred by the debtor in the ordinary course of business or
> financial affairs of the debtor and the transferee" does not
> specify that the test must be either subjective or objective.
> This is in contrast to the requirement of § 547(c)(2) that the
> transfer satisfy one of two tests, the subjective test stated in

---

[28] *Redmond v. CJD*, ___ B.R. ___, 2015 WL 5301557 at *11.

[29] *Fitzpatrick v. Central Communications and Electronics, Inc. (In re Tennessee Valley Steel Corp.)*, 203 B.R. 949, 953 (Bankr. E.D. Tenn. 1996).

[30] *Redmond v. Ellis County Abstract & Title Co. (In re Liberty Livestock Co.)*, 198 B.R. 365 (Bankr. D. Kan. 1996).

[31] *Fidelity Sav. & Inv. Co. v. New Hope Baptist*, 880 F.2d 1172 (10th Cir. 1989).

[32] *In re Tennessee Valley Steel Corp,* 203 B.R. at 954.

[33] *In re C.W. Mining Co.*, ___ F.3d ___, 2015 WL 4717709 at *3-*4.

19

§ 547(c)(2)(A) or the objective test stated in § 547(c)(2)(B). The Tenth Circuit's directive that the incurrence of the debt requirement "be read in light of the 'general policy of the preference section to discourage unusual action by either the debtor or [its] creditors during the debtor's slide into bankruptcy'"[34] does not require a choice between the two alternatives. An objective test was applied by the Tenth Circuit in *C.W. Mining* because there was no history of transactions between the debtor and its creditor. *Ahaza Systems*, the Ninth Circuit opinion relied upon by the Tenth Circuit when adopting an objective test for first-time transactions, states, "[t]o determine what is 'ordinary' among parties who have interacted repeatedly, we inquire into the pattern of interactions between the *actual* creditor and the *actual* debtor in question, not about what transactions would have been 'ordinary' for either party with *other* debtors or creditors."[35] With respect to the requirement of § 547(c)(2) that the debt be incurred in the ordinary course of business or financial affairs of the debtor and the transferee, in some cases, the circumstances will render the subjective test predominant, and in others, the objective test will be the most important. By having both tests available, courts can be gatekeepers to assure that the ordinary-course defense applies to promote the purpose of the defense — to discourage unusual action by either the debtor or [its] creditors during the debtor's slide into bankruptcy.[36]

In this case, GMAC relies on the subjective test and the long history of dealings between GMAC and Brooke Capital. The Trustee relies on the objective test and contends it is not satisfied because BASC and Brooke Capital commingled the insurance premiums, contrary to the Agency Agreement and state law governing insurance agents'

---

[34] *Id*. at 11 (*quoting Union Bank v. Wolas*, 502 U.S. 151, 160 (1991)).

[35] *Wood v. Stratos Pro. Devel., LLC (In re Ahaza Sys., Inc.)*, 482 F.3d at 1124.

[36] *Redmond v. CJD*, ___ B.R. ___, 2015 WL 5301557 at *11.

20

handling of premiums.[37]

There is no doubt that Brooke Capital's debts to GMAC were incurred in the ordinary course of business between the two parties. From GMAC's perspective, the procedures for paying it premiums collected by Brooke agents did not change from 2002 until October 22, 2008, when the Special Master terminated the procedures. Throughout the agency relationship, including the 90 days prior to the filing of the bankruptcy petition, in accord with the Brooke Insurance Transactions System, premiums were collected by Brooke-affiliated agents and deposited into bank accounts in the name of BASC. The premiums were paid to GMAC through ACH requests on the GMAC Sweep Account in the name of Brooke Capital. Brooke Capital's debt to GMAC arose because of the Brooke Insurance Transactions System under which the premiums collected by Brooke agents for GMAC policies were initially transferred to a BASC sweep account and then to BASC's Consolidated Receipts Trust Account (the CRTA), and finally transferred to Brooke Capital for accounting, paying securitized-debt obligations, and paying GMAC from a GMAC-specific deposit account in the name of Brooke Capital. There were no unusual transfers made to GMAC and no unfulfilled requests for payment

---

[37] The summary judgment motions and related pleadings in this case were filed before the Court announced in *CJD* its approach to resolving the competing considerations under the subjective and objective tests, and before the Tenth Circuit issued its opinion affirming the BAP's opinion in *C.W. Mining*. The Trustee's arguments in support of the objective test and GMAC's arguments in support of the subjective test were therefore presented as if the Court would select and apply one test to the exclusion of the other. Nevertheless, the Court finds no need to request additional briefs addressing § 547(c)(2) since the parties' positions under the *CJD* test can be clearly understood from the extensive briefs already before the Court.

made by GMAC during the preference period. In addition, it is undisputed that the procedures for paying premiums to GMAC were not unique.[38] The Brooke Insurance Transactions System utilized for processing GMAC's premiums was the same as that for other insurance carriers having agency relationships with BASC.

Nevertheless, the Trustee contends that the ordinary-course defense is not available to GMAC because Brooke Capital's debt to GMAC was not a typical arms-length creation of debt arising in the open market, which the Trustee asserts is the hallmark of an objectively-ordinary transaction. The Trustee argues that the commingling of insurance premiums with commissions paid by other carriers, with premiums from other carriers, and with Brooke Capital's other funds constituted a breach of trust, therefore making the defense unavailable.

The Court rejects these arguments. First, as stated above, the Court finds that the debt was incurred in the ordinary course of business based upon the long history of transactions which did not change (except inside Brooke Capital) in response to Brooke's financial difficulties. Under the circumstances of this case, whether the debts were incurred in arms-length transactions is not the controlling test. Second, the Court has examined the allegations and finds there was no breach of trust which precludes the ordinary-course defense.

The Tenth Circuit's *C.W. Mining* decision does not support the Trustee's argument

---

[38] *See* doc. 153-9 at 11 n. 15 (Expert Report of Kent E. Barrett) ("Brooke Capital had online sweep accounts for 133 carriers.").

Case 10-06197    Doc# 165    Filed 09/29/15    Page 22 of 38

that a breach of trust, if it occurred, overcomes GMAC's evidence that the debt was

incurred in the ordinary course. Nevertheless, because the Tenth's Circuit's decision in

*Fidelity*[39] suggests that the source of the transactions should be examined, the Court will

examine whether there was a breach of trust. In *Fidelity*, the court addressed "whether

§ 547(c)(2) . . . applies to a transfer unrelated to the payment of trade debt."[40] Debtor

Fidelity had been in the business of making small, high-interest consumer loans, and it

did this by regularly borrowing money through selling certificates to small investors and

then lending the proceeds out at higher rates. Suit was brought to recover distributions

made to small investors during the preference period. Prior to an amendment in 1984,

§ 547(c)(2) had applied only to the payment of a trade debt incurred within 45 days

before the transfer. After reviewing the legislative history and case law, the Circuit held

that the subsection as amended in 1984 was not limited to trade debt. It also affirmed the

finding that Fidelity's long-term debt represented by the certificates sold to small

investors "was a regular part of its daily business, much like a bank or savings and loan

institution."[41] The Circuit rejected the contention that the lower court's ordinary-course

finding was erroneous on the basis that the defense did not apply to "transactions which,

from their inception, were designed to work a fraud"[42] and that Fidelity had engaged in

---

[39] *Fidelity Savs. & Inv. Co. v. New Hope Baptist*, 880 F.2d 1172 (10th Cir. 1989).

[40] *Id*. at 1173.

[41] *Id*. at 1177.

[42] *Id*. at 1178.

such activity. Although Fidelity's securities registration had been suspended by the state, the Tenth Circuit affirmed the lower court reasoning that Fidelity's funding of its loan operations through the selling of certificates was a legitimate form of capitalization, and that there was no evidence of a Ponzi scheme or other inherently fraudulent operations. "While the subsequent conduct of its business may have been deficient, these deficiencies were not so pervasive as to render the whole of Fidelity's operations outside of the ordinary course of business."[43]

The Court therefore turns to a consideration of whether Brooke Capital's commingling of GMAC's premium payments precludes satisfaction of the debt-incurred element of the ordinary-course defense. The Trustee has two prongs to his argument that the debts were suspect. First, he contends that the BASC-Brooke payment procedures violated the GMAC Agency Agreement. Second, he contends that the procedures violated Kansas law.

The Trustee's argument that the debt was incurred in breach of the Agency Agreement relies upon the last sentence of Article V(3).[44] That sentence states, "Agent agrees to hold all premiums collected by him as a fiduciary in trust for the Company until payment shall have been duly made to the Company." The Trustee interprets this sentence to mean that all collected premiums are to be held in trust by depositing them into accounts where they could be traced as premiums attributable to GMAC policies.

---

[43] *Id.*

[44] Article V is quoted in full above in Part C of the Uncontroverted Facts.

24

According to the Trustee, since in his view the GMAC premiums were commingled and cannot be traced, there was a breach of the Agency Agreement.

The Court rejects this interpretation of the Agency Agreement. The Trustee's broad reading of the Agency Agreement is not supported by the plain meaning of the contract. The full subsection three of Article V provides:

> 3.    Should any renewal, additional, or endorsement premiums on business written pursuant to this Agreement come into the Agent's hands, the Agent shall remit said premium in gross to the Company within the time period set forth from time to time by the Company. Further, Agent agrees to hold all premiums collected by him as a fiduciary in trust for the Company until payment shall have been duly made to the Company.[45]

Subsection two of Article V provides that GMAC (the "Company") will directly bill all renewal or adjustment premiums. A plain reading of subsection three, on which the Trustee relies to establish a breach of trust, in conjunction with subsection two, shows that the requirement that premiums be held in trust is limited to renewal, additional and adjustment premiums, which GMAC will directly bill to the insured and are not expected to come into the possession of the agent. There is no evidence that any of the preferential transfers were for renewal, additional, or adjustment premiums. Subsection one of Article V applies to initial premiums, which are the premiums in issue here. It provides that the agent shall collect and remit to GMAC the initial premium within the time period

---

[45] Doc. 153-1 at 4.

Case 10-06197    Doc# 165    Filed 09/29/15    Page 25 of 38

determined by GMAC, which was four business days after a transaction was entered into the computer systems. There is no contractual requirement in the Agency Agreement that the initial premiums be held in trust.

The Court's construction of the Agency Agreement as not requiring trust treatment of collected initial premiums is supported by the deposition testimony of Douglas Hanes, the designated representative of GMAC. When asked if GMAC expected BASC to hold premiums in trust until they were transmitted to GMAC, he testified that GMAC really didn't think about that, it "just wanted to make sure when we swept the account from BASC that the money was there."[46] "As long as we sweep the account and there's money in that trust account, then we are deeming that it's in trust."[47] In GMAC's view of its arrangement with BASC, premiums would be out of trust if a request sent to the GMAC Sweep Account was dishonored.[48] It didn't matter to GMAC what happened before that.[49] There is no evidence that funds were not available when requested by GMAC.

The Court's construction is also in harmony with insurance law. A respected treatise states:

> While the agent of the insurer is under the duty to
> account to the insurer, and while the relationship of an insurer
> and agent is fiduciary in character, the agent does not

---

[46] Doc. 155-2 at 8-9 (Hanes depo. at 37:22 to 38:4).

[47] *Id*. at 10 (Hanes depo. at 46:6-9).

[48] *Id*. at 20 (Hanes depo. at 104:20-24).

[49] *Id*. at 20 (Hanes depo. at 104:25 to 105:2).

> ordinarily hold the premiums received by him or her as a
> trustee nor as trust funds, but merely as a debtor who owes the
> insurer as creditor the amount of the premiums received by
> him or her in a separate account, nor remit to the insurer the
> identical money received by him or her from the insureds, but
> merely the net amount due the insurer.
>
> The agency contract may, however, stipulate that the
> agent holds the premiums as trustee for the insurer. Even
> under this type of clause, . . . the agent is not required to keep
> the identical money collected intact and turn it over to the
> company in that form.[50]

The Court therefore rejects the Trustee's contention that the transfers were made in

breach of the Agency Agreement.

The Court also finds that the handling of the GMAC premiums under the Brooke

Insurance Transactions System was not in violation of Kansas statutes. The statute on

which the Trustee relies is K.S.A. 2014 Supp. 40-247(a), which provides in relevant part:

> (a) An insurance agent or broker who acts in negotiating or
> renewing or continuing a contract of insurance, . . . and who
> receives any money or substitute for money as a premium for
> such a contract from the insured . . . shall be deemed to hold
> such premium in trust for the company making the contract. If
> such agent or broker fails to pay the same over to the
> company after written demand, . . . such failure shall be prima
> facie evidence that such agent or broker has used or applied
> the premium for a purpose other than paying the same over to
> the company.

Section (b) provides that if an agent or broker violates the statute, he or she shall be guilty

of a felony or a misdemeanor, depending on the value of the insurance premium involved.

---

[50] Steven Plitt, et al., 4 *Couch on Insurance*, § 54:5 (3d ed., database updated June 2015), *obtained from* Westlaw at 4 *Couch on Ins.* § 54:5.

Case 10-06197   Doc# 165   Filed 09/29/15   Page 27 of 38

The leading Kansas case construing the statute[51] has identified its three purposes. First, it benefits an insured who pays the premium on a policy to an agent of the insurer by protecting his rights under a policy "irrespective of defalcations of the broker or agent respecting his payment to the insurer."[52] Second, it gives the insurer "a greater remedy to collect from the broker or agent who has colleted from the insured than is given ordinarily by statute for the collection of an ordinary account."[53] Third, it provides that an agent who fails to account to the insurer is prima facie guilty of a crime.[54]

There is no Kansas case law construing the statute to mandate that all insurance premiums collected by an agent be held in trust in a segregated account or be traceable. The wording of the statute does not invite such a construction, since it merely says that the premiums shall be "deemed" to have been held in trust, not that such premiums shall be held in a segregated account and not commingled with other funds.

If, as opined by the Trustee's expert, BASC's and Brooke Capitol's method for handling the premiums was contrary to the industry custom and practice,[55] this does not mean that the premium transactions from their inception were designed to work a fraud,

---

[51] *Riddle v. Rankin*, 146 Kan. 316, 69 P.2d 722 (1937).

[52] *Id*., 146 Kan at 322, 69 P.2d at 726.

[53] *Id*.

[54] *Id*.

[55] *See* doc. 153-11 at 4-8 (Expert Report of Jim Leatzow). But the evidence in this case is that 133 carriers had online sweep accounts with Brooke Capital. Doc. 153-9 at 11 n.15 (Expert Report of Kent E. Barrett).

28

which *Fidelity* suggests would be sufficient to render the ordinary-course defense unavailable. The purpose of the ordinary-course exception is to "'leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.'"[56] "With respect to incurrence of the debt, the requirement must be read in light of the 'general policy of the preference section to discourage unusual action be either the debtor or [its] creditors during the debtor's slide into bankruptcy.'"[57] In the Court's view, the suggested uniqueness of Brooke Capital's method of handling premiums does not constitute a reason to disrupt the normal financial arrangements of GMAC, BASC, and Brooke Capital. The method was not inherently fraudulent. It accomplished the timely payment of collected premiums to GMAC until the method was terminated by the Special Master six days before Brooke Capital filed for bankruptcy relief. If the GMAC premiums had been collected by BASC, transferred to Brooke Capital, and paid to GMAC through ACH transfers from the GMAC Sweep Account in the name of Brooke Capital without any commingling, as the Trustee contends should have been done, the antecedent debt and the transfer payments would not have changed. In other words, the fact that premiums collected on GMAC's behalf may

---

[56] 4 Norton Bankruptcy Law & Practice 3d § 66:19 at 66-79 (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 373 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 88 (1978)); *see also In re Hedged-Invs. Assocs., Inc.*, 48 F.3d 470, 475 (10th Cir. 1995).

[57] *In re C.W. Mining*, ___ F.3d ___, 2015 WL 4717709 at *4 (*quoting Union Bank v. Wolas*, 502 U.S. at 160).

not be traceable had no impact on the preferential transfers.

The second requirement of the ordinary-course defense is stated in § 547(c)(2). It requires that the "transfer was (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or (B) made according to ordinary business terms." GMAC contends that § 547(c)(2)(A) is satisfied because of the long-standing course of business between GMAC and the Debtor, which from GMAC's perspective did not change during the 90 days prior to the filing of the petition. The Trustee emphasizes that the transfers must be ordinary for both the creditor and the debtor, alleges that they were not ordinary-course events for Brooke Capital because the details of the Brooke Insurance Transactions System changed during the preference period, and argues that GMAC's lack of knowledge of these changes is not relevant.

The Court finds that the transfers were in the ordinary course of the financial affairs of both GMAC and Brooke Capital. Courts commonly look to the following four factors to determine whether a payment was made in the ordinary course of business of the debtor and the transferee:

> (1) length of time the parties were engaged in the type of dealing at issue;
> (2) whether the amount or form of tender differed from past practices;
> (3) whether the debtor or creditor engaged in any unusual collection or payment activities; and
> (4) the circumstances under which the payment was made.[58]

---

[58] *In re C.W. Mining*, 2015 WL 4717709 at *5.

"Absent other peculiar circumstances, a payment made shortly before or at the due date will satisfy the statutory requirement."[59]

The Court finds that these factors are satisfied. GMAC established its agency relationship with BASC by the Agency Agreement Addendum dated October 4, 2002, and from that date forward, for each policy sold, received payment from Brooke Capital four business days after the entry of the transaction into the system by initiating an ACH withdrawal from a designated Brooke Capital account. Neither the timing nor the method of payment changed throughout this period. GMAC never contacted BASC or Brooke Capital regarding the payments. GMAC was unaware of Brooke's financial difficulties, including the BONY litigation which resulted in the appointment of the Special Master. Brooke Capital's changes in the flow of funds within Brooke did not affect payments to GMAC.

The Trustee contends that the transfers were not ordinary course because during the preference period, Brooke Capital made dramatic changes in the flow of monies in the accounts which were part of the Brooke Insurance Transactions System. He relies primarily upon *Milwaukee Cheese*.[60] In that case, a preference action was brought to recover alleged preferential payments made by the debtor to employees and others participating in the debtor's "thrift savings plan," which actually constituted unsecured debt investments in the debtor. The plan was a long-term investment, and for a

---

[59] *Id.* at *5.

[60] *In re Milwaukee Cheese*, 112 F.3d 845 (7th Cir. 1997).

31

participant to demand payment in full was abnormal. Yet during the preference period, the debtor repaid all the "depositors," whether they asked to withdraw their investments or not. The circuit held that the ordinary-course defense was not available. "Even if these transactions were ordinary from the transferees' perspectives (they weren't), they must be ordinary from the debtor's perspective too."[61] The evidence showed that the transfers were not normal for the debtor. The debtor's managers knew the firm was in financial trouble; the managers knew that the plan was a major source of the firm's working capital, not a savings account of any kind; the depositors were repaid whether or not they asked for their money back; and the disbursements constituted approximately 15% of the firm's total value, greatly exceeded its cash on hand, and were funded by a bank loan.

The Trustee argues that factually, *Milwaukee Cheese* is "on point with this situation,"[62] but the Court disagrees. The similarity stops with the fact that GMAC, like some of the participants in *Milwaukee Cheese*, was unaware of the Debtor's financial distress. Brooke Capital's unusual circumstances are the facts that it changed the flow of funds within the Brooke Insurance Transactions System and that the Special Master was appointed. But these events did not directly impact the transfers to GMAC. As the *Milwaukee Cheese*, the court observed:

> A sudden payment in full of all debts in a discrete

---

[61] *Id.* at 848.

[62] Doc. 161 at 33.

category, in anticipation of bankruptcy and for the purpose of helping a favored class of creditors, is the paradigm of a preference. Section 547 is designed to discourage (by eliminating the fruits of) a race immediately before bankruptcy to get all of one's own debt repaid, and let the devil take the hindmost — for this race, costly to the runners, can impose even greater costs on other creditors (who must strive to protect themselves, perhaps by filing premature bankruptcies, and bear extra losses if they do not) and the firm itself, less able to compete in product markets with its assets scattered. The exceptions in § 547(c) identify cases where there is little risk that the pre-bankruptcy payments will give rise to this race and to the concomitant costly self-protection. A debtor who routinely receives a phone bill on the 5th of the month and pays on the 20th acts in the ordinary course; even if the phone company turns out to be a favored creditor (because the debtor neglects to pay other bills at the same time), the routine payment of regular bills is some distance from the problem at which § 547 itself is directed, and the cost of tracking down and retrieving each payment would be excessive. So if Milwaukee Cheese paid its regular bills in the three months before bankruptcy on a regular schedule, the recipients would be protected by § 547(c)(2), even if the bills were attributable to its illegal banking operations. Just so if the "depositors" received regular monthly payments from their "accounts."[63]

The transfers at issue here are much more similar to the regular payment of a utility bill than to the payment of the "depositors" in *Milwaukee Cheese*. During the preference period, the flow of premiums to BASC and then to Brooke Capital did not change, and the transfers to GMC did not change. The operating capital of Brooke Capital was not impacted. The situation is far removed from the problematic transfers which § 547 seeks to discourage. The transfers to GMAC are protected, even though those transfers were

---

[63] *Id*. at 847-48 (citations omitted).

processed through a system that was changing because of Brooke's financial problems.[64]

For the foregoing reasons, the Court sustains GMAC's ordinary-course-of-business defense to the Trustee's preference claims.

### C. GMAC has not shown that the transfers were contemporaneous exchanges for new value under § 547(c)(1).

GMAC also relies on the contemporaneous-exchange defense of § 547(c)(1). "[U]nder section 547(c)(1) a transfer that would otherwise be considered preferential is insulated from attack by the trustee if (1) the preference defendant extended new value to the debtor, (2) both the defendant and the debtor intended the new value and reciprocal transfer by the debtor to be contemporaneous and (3) the exchange was in fact contemporaneous."[65]  The purpose of this exception to preferential transfers, "like that of the other section 547(c) exceptions, is to encourage creditors to continue to deal with troubled debtors without fear that they will have to disgorge payments received for value given."[66]  The defendant has the burden of proof.[67]

The overarching deficiency in GMAC's presentation of this defense is the failure

---

[64] In support of his position, the Trustee argues that the ordinary-course defense also fails because "GMAC has . . . not created a sufficient baseline record to show that the preference period payments were ordinary when compared to the pre-preference period dealings." Doc. 161 at 33.  This refers to the absence of evidence showing how the funds flowed through Brooke Capital's accounts, so there is no baseline for comparing the pre-preference and preference periods.  But as the Court has held, these internal transactions are not relevant; what matters is the flow of premium dollars to Brooke Capital and then on to GMAC within four business days.  The uncontroverted facts are that this did not change.

[65] 5 *Collier on Bankruptcy,* ¶ 547.04[1] at 547-41 to -42 (Alan N. Resnick & Henry J. Sommer, eds.-in-chief, 16th ed. 2015).

[66] *Id.* at 547-42.

[67] See 11 U.S.C. § 547(g).

34

to identify the new value it provided to Brooke Capital. "New value" for purposes of § 547(c)(1) is defined by § 547(a)(2) to include "money or money's worth in goods, services, or new credit." GMAC did not provide goods, services, or new credit to Brooke Capital. The insureds to whom GMAC provided services were customers of BASC's agents, who had no relationship with Brooke Capital.

GMAC therefore argues that new value may be present in a three-party situation, citing *Jones Truck Lines*, an Eighth Circuit decision.[68] In *Jones*, the trustee sought to avoid contributions the debtor had made within the preference period to Central States, an employee pension and health and welfare plan established through collective bargaining. Central States asserted the contemporaneous-exchange defense. With respect to the new value element, the circuit held that although no new value flowed from Central States to the debtor, the debtor received new value in exchange for the transfers in the form of services from its employees on whose behalf the transfers were made as part of their compensation.[69] The three parties involved were (1) the debtor, who made the transfers sought to be avoided, (2) Central States, who received the transfers but provided no goods, services, or credit directly to the debtor, and (3) the debtor's employees, who provided current services to the debtor in return for compensation that included the transfers to Central States. In other words, the transfers to Central States were made for

---

[68] *Jones Truck Lines, Inc., v. Central States, Southeast and Southwest Areas Pension Fund (In re Jones Truck Lines, Inc.)*, 130 F.3d 323 (8th Cir. 1997).

[69] *Id*. at 327.

35

the benefit of the employees in exchange for their ongoing services.

But even assuming that this three-party new-value analysis would be accepted by the Tenth Circuit, GMAC has failed to identify the third party who provided new value to Brooke Capital in a manner analogous to the employees in *Jones Truck Lines*. The three parties identified by GMAC are (1) Brooke Capital,[70] who made the transfers, (2) GMAC, who received the transfers, and (3) the purchasers of GMAC insurance. But there is no evidence that the purchasers of GMAC insurance provided any goods, services, or new credit to Brooke Capital. GMAC was the only beneficiary of the transfers Brooke Capital made to it.

GMAC also argues that it provided new value in exchange for the payments in multiple indirect ways in the form of goods and services. Paying GMAC allowed BASC to continue its ongoing relationship with Brooke Capital's franchisees. The sale of insurance policies provided Brooke Capital with an income stream. Payment of the premiums allowed the Brooke agents to continue their relationships with their customers. None of these benefits from the payment of premiums to GMAC qualify as new value under § 547(c)(1). "The 'new value' described in § 547(c)(1) . . . must be 'given to the debtor' by the creditor as part of a 'contemporaneous exchange.' Thus, it is the precise benefit received from the creditor, and not the secondary or tertiary effects thereof, that

---

[70] GMAC's brief identifies this party simply as "Brooke." Doc. 159 at 10. Since the debtor must be included in the new value analysis, the Court construes "Brooke" to mean Brooke Capital.

must fit within the" definition of new value.[71]  Further, since § 547(c)(1) protects transfers only "to the extent" the transfer was a contemporaneous exchange for new value, the new value given to the debtor must approximate the worth of the assets transferred to the creditor.[72]

In addition to proving the extension of new value, a preference defendant relying on § 547(c)(1) must prove that both the defendant and the debtor intended the new value and reciprocal transfer by the debtor to be contemporaneous and that the exchange was in fact contemporaneous.  The Trustee argues that these elements are not present.  But because the new value GMAC extended to the Debtor has not been identified, the Court finds it impossible to analyze these elements.

**CONCLUSION.**

After careful consideration of the uncontroverted facts and applicable law, the Court finds that summary judgment should be granted to GMAC and that the Trustee's motion for summary judgment should be denied.  As discussed above, the Court finds that the Trustee has prevailed on his contention that the $1,109,567.67 transferred by Brooke Capital to GMAC between July 30, 2008, and October 21, 2008, was preferential under § 547(b), but that the Trustee may not avoid those transfers because GMAC has shown the transfers were made in the ordinary course of the financial affairs of Brooke Capital

---

[71] *Baker Hughes Oilfield Operations, Inc., v. Cage (In re Ramba, Inc.)*, 416 F.3d 394, 399 (5th Cir. 2005).

[72] *Lowrey v. U.P.G., Inc. (In re Robinson Bros. Drilling, Inc.)*, 877 F.2d 32, 34 (10th Cir. 1989).

and GMAC, as defined by § 547(c)(2). However, the Court also finds that GMAC has not shown that the contemporaneous-exchange defense of § 547(c)(1) is applicable. Because the Court finds that the funds transferred to GMAC were the property of Brooke Capital, the Trustee's fraudulent conveyance claim is moot. Likewise, because the Court grants GMAC's motion for summary judgment on the preferential transfer claim, the Trustee's claim for prejudgment interest is also moot.

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure, which makes Rule 52(a) of the Federal Rules of Civil Procedure applicable to this proceeding. A judgment based upon this ruling will be entered on a separate document as required by Federal Rule of Bankruptcy Procedure 7058, which makes Federal Rule of Civil Procedure 58 applicable to this proceeding.

**IT IS SO ORDERED.**

# # #

38